# THE PREROGATIVE COURT

OF

# THE STATE OF NEW JERSEY.

## FEBRUARY TERM, 1897.

---

ALEXANDER T. McGILL, ORDINARY.

---

SUSAN DAVIS

*v.*

EDWARD ELLIOTT.

Upon the facts of this case, the finding of an orphans court that a will signed by a mark is a forgery, set aside as against the weight of evidence.

On appeal from a decree of the Camden county orphans court, which denies probate to a paper which purports to be the last will of Mary Ann Elliott, deceased.

*Mr. John W. Wescott,* for the appellant.

*Mr. Henry S. Scovel* and *Mr. Frederick Rex,* for the respondent.

Davis v. Elliott.

THE ORDINARY.

The paper in dispute is signed by two ink lines drawn across each other at right angles, which purport to be the mark of Mary Ann Elliott. The validity of the paper, as her will, is questioned upon the insistence that this mark was not made by her and that the document is a forgery.

Before she married, Mrs. Elliott sold vegetables at market. There she met Elliott, a butcher, who was a widower with two young children, Henry and Susan. She married him and by him had one child, a son, named Edward. Before the paper in dispute was made the three children had grown up to manhood and womanhood, and the husband had died. The two boys made their residence at Williamstown, in Gloucester county, and the daughter went to reside in Camden, leaving Mrs. Elliott alone at Haddonfield, about nine miles from Camden. She saw but little of the two boys, except when one or the other of them wished to borrow money from her. Her own son, Edward, is the caveator below and the respondent here. He appears to have offended his mother, after his father's death, by selling some farming implements and refusing to pay over the proceeds of their sale to her, and by abusing her when she demanded payment of the proceeds of sale from him. A justice of the peace, who had been employed by the mother to collect these moneys from the son, testifies that Mrs. Elliott cried when her son refused to pay and wrote abusively of her, and declared that she would punish him in her will. The evidence very clearly establishes that for a year or more before the disputed paper purports to have been made, and thereafter till the mother died, although the respondent lived only twenty miles away, he failed to visit his mother, and that his continued and marked neglect was a cause of distress, and, at times, of irritation to her, which moved her, upon occasions, to declare that he should not have any of her estate, and, upon other occasions, that he should not have any considerable portion of it. At the same time, while the proofs seem to indicate that this feeling of distress and irritation predominated, there were occasions when the maternal affection caused her to express feelings indicative of her relenting and giving her son the greater part of her estate.

The proofs do not show much of the life of the stepdaughter, Susan. They place her, at the date of the will, as a member of the family of her son-in-law, Philip W. Beale, a druggist and physician of Camden, and show that she was in the habit of visiting Mrs. Elliott weekly while the latter was well, and more frequently when she was sick. They also show that the relations between Mrs. Elliott and Susan were amicable, and such as should properly have existed between mother and daughter. Mrs. Elliott frequently visited at Dr. Beale's as a welcome guest. The proof is that she repeatedly asked the doctor to draw her will for her, and that from time to time he postponed it until the 10th of March, 1894, when, having previously secured a blank form in Philadelphia, he prepared the document in dispute.

The provision of the will is as follows: $500 to the son, Edward; $200 to a neighbor, whose daughter appears to have frequently acted as amanuensis for Mrs. Elliott; $50 to John Arthur, a former employe; $50 to another neighbor, and the residue of the estate to the husband's daughter, Susan Davis.

Precisely what the residuary estate is worth has not been disclosed, but the indications are that it constitutes the bulk of Mrs. Elliott's property. I gather that it is worth at least three or four thousand dollars.

If the subscribing witnesses to the will are to be believed, the document was drawn and executed in Dr. Beale's office, in his house adjoining his drug store, on the morning of the 10th of March, 1894, between seven and ten o'clock. Those witnesses are Dr. Beale and Edgar H. Landes, a veterinary doctor, who that morning happened to be in Dr. Beale's drug store. The testimony of members of the family of Dr. Beale is, in effect, that on the 10th of March, shortly after seven o'clock in the morning, Mrs. Elliott arrived at Dr. Beale's house; that the doctor was then yet in bed; that she said that she had come to have her will drawn by the doctor; that she breakfasted there; that she, Dr. Beale and Dr. Landes were together in Dr. Beale's private office for half an hour or more, and that when she came out of the office she declared that she had made her will. The sub-

scribing witnesses say that she dictated the will, and that Dr. Beale wrote it in a blank form, and that after it had been read over to her, she duly executed it in the presence of the witnesses, making her mark, for she was unable to write her name.

It is not claimed that Mrs. Elliott lacked capacity to make a will, nor that the will was the product of undue influence, nor that in its execution there was failure to comply with the requirements of the statute. The position boldly taken is, that the instrument was not executed by Mrs. Elliott; that the mark is a forgery and that the testimony of the subscribing witnesses is false. This position imputes a double crime to Drs. Beale and Landes. There is a suggestion that Dr. Landes may have been deceived by some one personating Mrs. Elliott, but his own testimony is that he knew Mrs. Elliott, and was not thus deceived.

Let us see upon what evidence the position rests.

The case was opened by the examination of the subscribing witnesses. Dr. Beale testified that all the written portions of the will were made at the same sitting, in the presence of Mrs. Elliott and Dr. Landes, with the same ink, but, possibly, not with the same pen. Dr. Landes testified that Mrs. Elliott dictated the will, and that Dr. Beale wrote it all with the same ink and the same pen, and then read it to her, and that she made her mark to it in the presence of the subscribing witnesses, who then signed in her presence and in the presence of each other.

An inspection of the instrument shows that at the end, in stating the date, the words "tenth," "March," "ninety-four," and thereunder, "Mary Ann Elliott, her ⊣⊢ mark," are written with apparently darker ink than the writing in the body of the will, and so, under the attestation clause, the names of the subscribing witnesses appear to be in somewhat blacker ink than that used in the body of the will, yet not so black as the words quoted.

The mark appears to have been made with some care by lines intended to be at right angles with each other. The horizontal line apparently was intended to follow a lead-pencil line immediately above it, which, to the right of the vertical line, is yet apparent. I think that the person who made the mark attempted

to follow the lead-pencil line, and that, commencing at the right, he or she moved along immediately under it for a quarter of an inch and then, inadvertently or because of defective eyesight, or inexpertness in the use of a pen, fell below it for a short distance, and then, discovering her error, returned to the point of divergence and from thence made a new line which ran upon the pencil mark. Thus, at its left, the horizontal line of the mark has two prongs of uneven length. The vertical line was evidently marked over partially, and perhaps wholly, more than once. It presents a patched appearance. Thus particular effort in making the mark is demonstrated.

The caveator produced four gentlemen as experts in hand-writing, all of whom expressed the opinion that the body of the will and the words at the end, which have been quoted, were not written with the same ink. The last sworn of these gentlemen expresses also the opinion that the particular effort in making the mark was not the habit of Mrs. Elliott, as her habit is demonstrated by three or four other marks received in evidence as hers, which he used for standards in comparison.

I do not acquiesce in the opinion of these gentlemen that different inks were used. I have very carefully examined the will with the aid of a powerful magnifying glass. The heavy strokes in the name of Mrs. Elliott at the very outstart of the instrument appear to me to be quite the same black and ink that appears in the suspected words. Possibly the ink is not quite as thick, but that may easily be accounted for by a deeper dipping of the pen in the sediment that is almost invariably found in the bottom of an inkstand. The thickness of the fine lines in the words written in the date indicates either a change of the pen or a dipping into sediment. But if I be mistaken in my opinion and another ink was used it does not by any means follow that the will is a forgery. It simply results that Drs. Beale and Landes are mistaken that the same ink was used throughout the completion of the instrument. The testimony shows that there were two inkstands and several pens on Dr. Beale's table, and that it was possible that two inks may have been used.

Davis *v.* Elliott.

When it is remembered that the subscribing witnesses testified fifteen months or more after the making of the will, during which many other important transactions may have intervened, they are not to be disbelieved in the important features of the will-making merely because they may be mistaken as to details which may not have impressed them as important at the time of the transaction. If the will were a forgery in which they must have been principals or accomplices, they would hardly, knowing that there were two inks on the table, have positively stated that one only was used. A guilty conscience would have constrained them to pretended forgetfulness or inattention to the trivial circumstances.

I do not think that any significance adverse to the will is to be drawn from the care exercised in making the mark. It is to be remembered that the will was important to Mrs. Elliott—so important that she had traveled from Haddonfield very early in the morning to be sure and find Dr. Beale. She probably thought that she was obliged to follow the pencil lines in making the mark, and, with the infirmities of her age and lack of education, found it difficult to do so, and hence her efforts. It is only a remote possibility that a forger, familiar with the usually careless habit of Mrs. Elliott in making her mark, would have resorted to such efforts.

Upon the apparent conflict of the opinion of the experts with the statements of Drs. Beale and Landes, the interest of Dr. Beale and the insistence that the will is unnatural in the exclusion of the caveator from the greater portion of his mother's estate, the two associate judges of the orphans court, notwithstanding the dissent of the presiding or law judge, denied probate to the will.

Dr. Beale had some interest in the instrument which gave his wife's mother the bulk of Mrs. Elliott's estate, but precisely what that interest was, does not appear. It may be that his mother-in-law was not dependent upon him, and that his wife, after years, could expect only a fraction of the property that her mother might leave. But if we doubt his integrity because of this interest, there still remains Dr. Landes, appearing to the

court as an entirely disinterested and reputable witness, who was casually called upon to be present when the will was made, and who, in performance of his duty as subscribing witness, saw the whole instrument prepared and executed as the law requires. His testimony cannot be lightly set aside. And, in addition, Charles Mayer, the clerk of Dr. Beale, testifies that before the will was made Mrs. Elliott had told him that she meant to have Dr. Beale write her will, and that when he did so she wished Mayer would be a witness to it; that when the time came Dr. Landes was in the drug store, and Dr. Beale came from his office to get Mayer, as Mayer supposed, and, seeing Dr. Landes, asked him to be the second witness, saying to Mayer that Dr. Landes was preferable because of his age and experience. It was thus that the interview between Mrs. Elliott and the two doctors was impressed upon Mayer's mind. Moreover, it is shown by other entirely disinterested witnesses that, after the date of the will, Mrs. Elliott declared that she had made a will.

I do not find justification for the decree of the orphans court. The evidence relied upon by the respondent is, to my mind, insufficient to do more than to awaken suspicious scrutiny, which, I think, is quickly put at rest by the remaining evidence.

I will reverse the decree.